Hear you, hear you, hear you. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Good morning. We have four appeals to hear this morning. Judge Lagoa and I are very pleased to welcome our colleague from the Middle District of Florida, Judge Harvey Schlesinger to assist us with our work today and tomorrow. Judge Schlesinger is a senior district judge and as I said yesterday and the day before, when Judge Watkins from the Middle District of Alabama sat with us, we very much appreciate the assistance of our senior judges. The federal judiciary really couldn't function without them. They work for free. They're entitled to receive their retirement pay without doing any work. So the work they do for us is out of their shared devotion to the Constitution and our judicial duty and they shoulder about 20% of the workload of the federal judiciary. So they're a great bargain for the American people and we're very appreciative. We're very grateful that Judge Schlesinger is going to assist us this week. So we have the first case to hear this morning. Is it Bullion, Mr. Smith? Yes, your honor. Bullion versus PNC. Counsel, we know about your cases. We've read your briefs. The authorities cited in your briefs. You have limited time this morning. You should feel free to get to the heart of your argument. We're probably going to have some questions this morning but be mindful of the clock and respectful of our time. When the clock expires, it's time for you to wrap it up and not just wait for me to tell you to wrap it up. On the other hand, if you're answering a question from the court, please feel free to finish your answer. If you have rebuttal time, you won't lose it if you're just answering a question from the court. But with those ground rules in mind, Mr. Smith, will you speak with us, please? Thank you, your honor. Good morning. Good morning and may it please the court. My name is Ian Smith and I am counsel for appellate Rafiqul Bullion. This case asks this court to examine how it analyzes discrimination and retaliation claims based on religion. And it asks this court to revisit what constitutes an adverse employment action when an employer fails to reasonably accommodate an employee's religious beliefs. We believe there are three issues before this court. First, whether forcing an employee to make the cruel choice of choosing between his religion and his job is itself an adverse employment action under Title VII. Does our recent decision in Bailey affect your argument? Your honor, I would say that the Bailey case is clearly distinguishable here. And in Bailey, while the court is reviewing a failure to accommodate case, in Bailey, the court held that the employer granted the reasonable accommodation. In this case, Mr. Bullion's case, the reasonable accommodation for Mr. Bullion's religion was not granted. And Mr. Bullion was required to make a choice between the reasonable accommodation and his job. I guess the problem I had with this, as I was looking at this case, was whether your client had really made a record that his faith really required him to take one course of action that the employer refused to accommodate. It's one thing to say, I would like to have a day off to observe a religious day. But it's another thing to say that my faith would not permit me to work on that day. And I'm not sure that we have a record that that there was that kind of choice. Well, your honor, thank you. I believe that the record demonstrates that Mr. Bullion advised his employer of his religious beliefs, of his request to take, I believe you're referring to the second day of July 28, 2014, where he requested the day off for the in celebration of the El Alphateer celebration. The record, we believe your honor shows that he did communicate this. And it's simply a matter of the employer making judgments about the manner in which he described this as a celebration that is similar to Christmas in the Christian faith. It appears that the employer was making its own interpretation on the sincerity. I mean, he worked, right? He ended up working that day. Right? Yes, your honor. And he never communicated to his employer that his religion would forbid him from working that day, did he? He would like to have the day off. You know, I'm Catholic, I might want to have the Feast of the Ascension off. But my faith doesn't say I can't work that day. Wasn't he obligated to show that there was a clear conflict between his faith and what his employer was requiring? And if he went to work, and never communicated that his faith prohibited him from going to work? How can we say there was that kind of clear conflict? Your honor, it's not whether he's under Title Seven, your honor, he's required to communicate that he is requesting a reasonable accommodation, based on his religious beliefs, and whether communicating that say that is that it's not necessary for him to demonstrate that his religion forbade him from taking the day off. It's this cruel choice, your honor, that that we're arguing that the requirement of doing of being forced to take this cruel choice, that in and of itself, a question regarding the cruel choice argument that you make, is there any case law out there that establishes that a cruel choice establishes an adverse action requirement? Your honor, we found no case law that uses this term cruel choice. But this is not a not a concept that's that's even unfamiliar in before this court. We brought a supplemental authority regarding a 1975 case of Young versus Southwestern Savings Loan Association, where the court found in that case, where this court found that a employee, that an employee who would refuse to attend a prayer breakfast, an employee who was an atheist, that that employee being required to take to attend that prayer breakfast, that that constituted a constructive discharge when that employee resigned. So this court has held and introduced the rule back in 1975, where the mere choice, the requirement of having to ignore or to choose between one's religious beliefs, that that in and of itself, is a adverse employment action. May I go talk about since your time is getting short about the retaliation claim, what evidence do you have in the record that that provides an inference that the decision makers who were included in the decision to terminate Mr. Booyan had any religious animus toward him? Your Honor, the record is is filled with with instances of where of where Mr. Booyan complained about comments and other negative comments about his his faith and other comments about uh well comments about about his faith. So and he brought these he made these complaints to the to the management at PNC Bank. There are numerous facts in the record where Mr. Booyan is complaining that specific individuals made comments. But none of that was from the decision makers that decided to terminate him. Well, Your Honor, I mean that's correct that that was not that that these statements that weren't weren't attributed to the to the decision makers. But it's clear that the decision makers were aware of the complaints that Mr. Booyan had made. And that the in making these decisions, these the decision makers were aware of Mr. Booyan's of the complaints previously. Let me ask you just one other thing. Didn't Mrs. May testify that when she asked her client whether having that day off was a religious requirement, he said no, it wasn't? I'm not sure if that's if that is completely the way the record reflects. Mr. Booyan may not have may not have used those terms. But it was clear that this was a religious that this was a part of the religious practices in Miss Bay. Mr. Booyan had been reasonably accommodated for this in years past. And, and, and PNC Bank had offered him this accommodation previously. So it's not clear that those that those specific terms were used, Your Honor. I see that my time is just about to expire. Judge Schlesinger, do you feel he answered your question sufficiently? That is, that's fine. Thank you. Okay. Mr. Hill. Good morning, Your Honors. May it please the court. My name is Stan Hill. And I'm representing Appellee PNC Bank. PNC Bank holds money and provides financial services for its customers. And naturally, honesty and safety are very important at PNC Bank and reflected in the ethics and the fidelity bonding requirements. And the enforcement of those principles is what is what brings us here today on Mr. Booyan's termination. I would like to address though, first, the accommodation claim, which the panel had asked some questions about and specifically referred to the Bailey case, which the 11th Circuit issued earlier this year, reconciling the Abercrombie decision of the Supreme Court with the prima facie elements of a religious accommodation claim. And in doing so, reaffirmed two bedrock principles that are fatal to Mr. Booyan's claim here. The first of which being that there must be a conflict between the religious belief and the employment requirements, which is not met here on the July 28th day for the Eid festival. Notably, Eid begins at sundown after bankers hours end. And Mr. Booyan admitted in his deposition that he was able to celebrate the holiday with his family after work. His original request by email stated that it was a personal day and a holiday celebration similar to Christmas. And that is subject to one and only one plausible interpretation that he was looking for exactly as he said, a personal day, not a religious day. Many people work on Christmas, though they are Christians and celebrate the holiday, but that does not preclude them from working on that day. And similarly with Mr. Booyan's case, the Eid holiday, he was able to celebrate it and work on that day. So there is no conflict. There's also no adverse employment action in the 11th circuit in the Bailey case reaffirmed that adverse employment action is an essential element of the prima facie case for a title seven religious accommodation claim. That is not met here either for the July 28th day or the July 25th day, the prior Friday. So are you conceding that there was a conflict on the 25th? Well, Mr. Booyan was accommodated with other Fridays off in that month, though his request for those Fridays off was made after the schedule was finalized. His request was honored and efforts were made to accommodate him on those Fridays for religious purposes so that he could have the prayer that he wanted. And as Mr. Smith referred to historically, yes, Mr. Booyan did have Fridays and Ramadan off, but yet every year it was still incumbent upon him to inform his employer timely and through the appropriate channels of his need for accommodation. And here in July 2014, he did not do so. He waited until after the schedule was finalized to communicate his request for Fridays off to a supervisor, and yet PNC made good faith efforts to accommodate him and in fact did accommodate him. July 4th was a federal holiday, a banking holiday, so that was not, no time off was needed. But on July 11th, he was given the time off. And on July 18th, in fact, the schedules were rearranged such that he would be able to take the time off. And then on July 25th, co-workers had pre-approved vacations. Another co-worker had a medical appointment for their child and was very important. And those requests do not cede under Hardison or under any of the circuit precedent to Mr. Booyan's request. And the company did what it could to try to accommodate Mr. Booyan. And in the end of the day, there wasn't enough coverage for the branch. And as a result, if you were only to have two employees there, as Ms. Graves testified, and it's undisputed in the record, that is a safety concern. And naturally, with money and other assets at a bank branch, staffing for safety is important. And that does satisfy the undue hardship standard under the analogous circuit precedents, which are cited in our brief and include the Beedle case, Beedle v. City of Tampa, where scheduling for police officers was found to be an undue hardship under analogous circumstances. As to the cruel choice argument, I would say first, the circuit precedent has required for a long time, and even all the way up to the Bailey case, an adverse employment action. And what is an adverse employment action? It's analyzed through an objective lens, and it must be so. The cruel choice that inherently subjective and undefinable. What is a cruel choice? Though there may be a conflict, what makes a choice cruel? These are standards that are inherently subjective and do not align with the precedent that an adverse employment action must be objectively defined, number one, but also a serious and material change in the terms and conditions of employment. That is other circuits that have addressed this issue. The Sixth Circuit case is cited in our briefing, and also going back to more bedrock cases that define the objective. The question I had earlier was that it seemed to me that the fact that he showed up on July 25th would allow the inference that there wasn't a clear conflict, and I just wasn't sure that there was any evidence that there was a clear conflict. Your Honor, there is not evidence in the record of that. The company took Mr. Bouillon in his request at good faith, and whether or not it was religious or not, they made an effort to give him what he wanted. And the employer can't be penalized for that, especially given that several days off were provided. There was no threat to Mr. Bouillon's job. There was no ultimatum show up or be fired. So I guess your point is that your client assumed that there was a clear conflict, and you've continued to assume there was, and your defense is, we tried to accommodate. As to July 25th, he was taken at his word, and efforts to accommodate him were made. There was not a concession by the employer about a conflict, but rather that we will do what we can to accommodate him, as they tried on July 28th. So, you know, we're talking about, you know, historically, in the heat of the moment, what were they trying to do for Mr. Bouillon? They were trying to do right by him at every turn with his accommodation requests. Now where we are legally, we look back at this, and you're right, your Honor, there is nothing in the record to say that July 25th was a conflict. But nevertheless, if even if it was, there was no adverse employment action, and certainly the case referred to by Mr. Smith from 1975, the Young v. Southwestern Savings Case, 509 F. Second, 140. That's a constructive discharge case. There, the Fifth Circuit wrote that it was obvious that there was a threat to the employee's job if the employee didn't come to the mandatory prayer meeting. Here, there is no threat. There is no constructive discharge claim, moreover, or allegation of constructive discharge anywhere in the briefing. And so that case we would submit is not applicable, and the person in the case- Mr. Hill, Mr. Hill, I'd like to ask you a hypothetical. So let's assume that Mr. Bouillon had refused to show up for work on the day, I can't remember if it was July 28th. And as a result of that, he was then disciplined. I mean, is that sufficient then to show an adverse employment action if he refused to show up? I'm sort of confused as to did the bank believe that he had a sincere belief that this was a religious accommodation request, or does he have to not show up in order for there to be an adverse employment action? So factually, in the record, it was the bank that raised the question first about is this religious? This is not a situation where the bank was oblivious or ignorant or willfully ignorant or blind to the circumstances. They were asking Mr. Bouillon for more information, and his response was something to the effect of it's like Christmas, and that's all he said. And so they were trying to make an effort to accommodate him, whether or not it was based in religion. And there was never any decision made or anything in the record to suggest that Mr. Bouillon's job was in jeopardy, whether or not he showed up on the 28th. He was simply told that his request for the time off was denied. And in order to assess your question directly, you know, discipline, we do need to know more about the hypothetical in order to come to a determination, because discipline in the abstract is not dispositive, whether it's a serious and material change in the terms of employment. There are some cases that do refer to discipline in a general sense as being something that could satisfy the prima facie case, but at the end of the day, what is discipline? Is it a verbal reprimand? That would not satisfy the objective standard of serious and material change. Were it to result in a termination, that's a different story. And that's akin to the Abercrombie case when you're talking about a failure to hire in the first instance. There's termination and failure to hire are clearly adverse employment actions that didn't happen here as a result of anything having to do with Mr. Bouillon's accommodation. Reduction in pay, that would be an example. Yes, Your Honor, a reduction in pay, I think would also satisfy, but again, nothing like that happened here. And the accommodation requests and how those were handled were through a completely separate channel and process than the investigations that led to Mr. Bouillon's termination. It's undisputed in the statements of undisputed material facts on the summary judgment briefing that the recommendation for termination arose out of the investigations of Mr. Bouillon's false claims against Ms. May and his conduct in that interview that occurred. There were two interviews that happened on the same day. The first to address his concerns about Ms. May and the second to address the concerns raised about his false referral. It can't be understated the importance of honesty and integrity in the banking industry and for PNC Bank, especially given the fidelity bonding requirements that are in place and PNC's code of ethics. It was in our briefs, but I feel compelled to note it, that in 2013 and 2014, and that was the year Mr. Bouillon was terminated, all 38 PNC employees in Alabama and Georgia who were found to have been dishonest were terminated, just like Mr. Bouillon. And eight of those 38 were found to have manipulated the sales incentive system, just like Mr. Bouillon. And so he said in his deposition, he was, quote, very aggressive with referrals, but he crossed the line. He was found to have crossed the line. He admitted that his conversation with the customer did not align with the documentation he put into the referral system. And he got $3 for that. He got a financial reward for that. And to allow an employee to put in false information and get money in return, that cannot be tolerated. Lawfully, it need not be tolerated. And Mr. Bouillon was terminated for that reason and for his other false statements that were documented in the investigations. There was a reference to the retaliation claim. I would say that, again, we have all the legitimate non-discriminatory, non-retaliatory reasons for that. And further, that as to protected activity and causation, the only protected complaints that Mr. Bouillon made concerned Ms. Best and statements that she allegedly made, which were far more than three months removed from his termination. And so the causal connection element of the prima facie case fails there as well. The Ms. May don't refer to anything of improper animus or bias. And neither of the decision makers, Ms. Graves or Ms. Parker, were shown to have any suggestion of bias or animus or retaliatory intent in anything that they did. The investigations, as I think you'll see from the record, were very well documented. The good faith basis, the good faith belief rule of Elrod v. Sears, which has been circuit law for over 30 years, would squarely control the conclusions that they drew from the investigation and resulted in Mr. Bouillon's termination. With that, your honors, if there are no further questions, I would gladly give back a couple minutes of time and request that the entry of summary judgment be affirmed for PNC Bank. Thank you, Mr. Hill. We'll always gladly take back time. Mr. Smith, you have five minutes. Mr. Smith, you're on mute. Thank you, your honor. Yes. Your honor, again, the Bailey case, this court's earlier 2021 decision in Bailey, it's clearly distinguishable here. What I'm mainly concerned about is what the test that it establishes, that it makes clear that the law requires and whether we have a record that would create a issue of material fact that you can satisfy that test. Well, your honor, may I just say that this idea of the choice, the employee being forced to make a choice between his job and his religion, that the EOC, your honor, in its 2021 compliance manual takes this position that the choice itself is an adverse action. Well, I'm not entirely sure that we have the choice. That was the reason from our questions earlier about Bailey saying that there has to be a conflict. I'm not sure whether we even really have a record of a conflict. Well, there is, your honor, that Mr. once Mr. Boyan requested the reasonable accommodation and he has denied that reasonable accommodation. He never tells his employer that his faith prohibits him from working that day. Well, your honor, he informed his employer that his faith required or that it was part of his religious beliefs that he needed reasonable accommodation. What he said was, I think, was that he would like to have that day off to observe a religious day. That's not putting your employer on notice that your faith would not allow you to work that day. Those are two different things, it seems to me. Your honor, the Supreme Court in the Abercrombie case shows that this knowledge requirement wasn't necessary. Again, with respect to this cruel choice, I think it's important for the court to understand that other circuits have taken up this issue and looked at it. The Third Circuit in the Story versus Burns International case and the Ninth Circuit, as well as the court in the Seventh Circuit, has viewed this. It's our argument, your honor, that this does change when an employee is forced to work or to choose the reasonable. When an employee is denied the reasonable accommodation and is forced to work over his religious beliefs, that does materially impact the terms and employment. Can I ask you a question, Mr. Smith? I think it's over your time, but the question I have is, my understanding of the religious holiday question here is that it occurs after sundown and your client was able to celebrate the religious holiday after the workday terminated with his family. What more does an employer need to do? That's where I'm having an issue. I think you're referring to the second request, the 28th and the 25th. Say, your honor, that he had, with respect to the 28th, if that's your to an undue burden. Is that true? I thought that on the 28th, they already had two requests that had been put in and approved. As a result of it, they would have had an undue burden because they would have been understaffed. That's the testimony of the regional manager, Graves. That's the evidence in the record. That's what the evidence shows. Do you have anything to disprove that record? We don't have anything to disprove the testimony that that was, in fact, the testimony of Ms. Graves. Your honor, it's in the record that there was no reviewing of schedules. I see that my time is expired. You can finish your answer. Let's say, your honor, there's nothing in, when I say there's, setting aside Ms. Graves' testimony, what I'm saying is that the company came forward with no real evidence of undue burden. We can't set aside testimony, Mr. Smith. I mean, you have a burden of presenting competing evidence that creates a genuine issue of material fact, but we don't set aside testimony. It's undisputed. Your honor, I would refer you to our briefing on this subject further, and we'd ask that the court reverse the district court here. Thank you, your honors. Thank you. Thank you.